25CA1651 Peo in Interest of RB 07-16-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA1651
El Paso County District Court No. 22JV30323
Honorable Diana May, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of R.B., a Child,

and Concerning K.S. and C.B.,

Appellants.

---

JUDGMENT AFFIRMED

Division III
Opinion by JUDGE KUHN
Freyre and Johnson, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 16, 2026

---

Kenny Hodges, County Attorney, Melanie Gavisk, Senior County Attorney,
Colorado Springs, Colorado, for Appellee

Josi McCauley, Guardian Ad Litem

Ainsley E. Baum, Office of Respondent Parents' Counsel, Denver, Colorado, for
Appellant K.S.

Harald Van Gaasbeek, Office of Respondent Parents' Counsel, Fort Collins,
Colorado, for Appellant C.B.

¶ 1    In this dependency and neglect proceeding, C.B. (father) and K.S. (mother) appeal the judgment terminating their parent-child legal relationships with R.B. (the child).  We affirm.

## I.    Background

¶ 2    The El Paso County Department of Human Services filed a petition in dependency or neglect alleging that the child tested positive for methamphetamines at birth, along with other concerns. The parents admitted to the petition and the juvenile court adjudicated the child dependent or neglected.  The court also adopted treatment plans for both parents.  The parents were each subsequently incarcerated, and the court amended the treatment plans to account for their incarcerations.

¶ 3    Later, the Department filed a motion to terminate parental rights.  Following a contested hearing, the juvenile court granted the motion.

## II.    Analysis

¶ 4    The parents contend that the juvenile court erred by (1) finding that they were unfit and could not become fit within a reasonable time; (2) improperly basing its fitness findings on their incarceration status; (3) finding that the Department made

reasonable efforts to rehabilitate them and reunite the family; and (4) failing to consider a less drastic alternative to termination of their parental rights.  We consider these contentions in turn.

## A.    Standard of Review

¶ 5    "Whether a juvenile court properly terminated parental rights presents a mixed question of fact and law because it involves application of the termination statute to evidentiary facts."  *People in Interest of L.M.*, 2018 COA 57M, ¶ 17.  We review the court's factual findings for clear error, and we review de novo its legal conclusions based on those facts.  *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10.  The credibility of the witnesses; sufficiency, probative value, and weight of the evidence; and the inferences and conclusions drawn from the evidence are within the juvenile court's discretion.  *People in Interest of A.J.L.*, 243 P.3d 244, 249-50 (Colo. 2010).

## B.    Fitness Within a Reasonable Time

¶ 6    Both parents contend that the juvenile court erred by finding that they were unfit and would not become fit within a reasonable time.  Both argue that they substantially complied with their treatment plans and demonstrated that they were fit parents.

Additionally, they assert that the juvenile court erred by primarily relying on their incarceration status — not their parenting — in terminating their parental rights. We are unpersuaded.

### 1. Applicable Law

¶ 7    A juvenile court may terminate parental rights if it finds by clear and convincing evidence that (1) the child was adjudicated dependent or neglected; (2) the parent has not reasonably complied with an appropriate, court-approved treatment plan, or the treatment plan has not been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change within a reasonable time. § 19-3-604(1)(c), C.R.S. 2025.

¶ 8    When, as here, a child is under six years old at the time a dependency neglect petition is filed, the juvenile court must consider the statutory expedited permanency planning (EPP) provisions, which require that the child be placed in a permanent home as expeditiously as possible. §§ 19-1-102(1.6), 19-1-123, 19-3-702(5)(c), C.R.S. 2025; *see People in Interest of S.Z.S.*, 2022 COA 133, ¶ 25.

¶ 9    A parent is unfit if their conduct or condition renders them "unable or unwilling to give the child reasonable parental care to

3

include, at a minimum, nurturing and safe parenting sufficiently adequate to meet the child's physical, emotional, and mental health needs and conditions." § 19-3-604(2). "In determining whether a parent's conduct or condition is likely to change within a reasonable time, the court may consider whether any change has occurred during the proceeding, the parent's social history, and the chronic or long-term nature of the parent's conduct or condition." *S.Z.S.*, ¶ 24.

¶ 10    What constitutes a reasonable time is fact specific and must be determined by considering each particular child's physical, mental, and emotional conditions and needs. *Id.* at ¶ 25. A "reasonable time" isn't an indefinite time. *Id.* And even when a parent has made recent progress on a treatment plan, the court is not required to give the parent additional time to comply. *See id.* at ¶¶ 24-25.

### 2.    Additional Background

¶ 11    During the proceedings, it was discovered that the child had significant medical needs stemming from a rare chromosomal disorder that caused the child to have, among other things, seizure activity, physical delays, developmental delays, speech delays,

attention-deficit hyperactivity disorder, and neurodivergent traits. The child regularly participated in nine weekly therapies to assist with his physical and mental development.

3. The Court Did Not Err by Finding that the Parents Were Unfit and Could Not Become Fit Within a Reasonable Time

¶ 12 The juvenile court found that the parents were unfit and were unlikely to become fit within a reasonable time. True, the court found that the parents substantially complied with their amended treatment plans "to the best of both parents' ability" while they were in custody. But the court put significant weight on the child's extensive medical needs and the parents' failure to comply with their original treatment plans while out of custody. It also found that the parents had not sufficiently developed a release plan detailing how they would meet the child's needs once free from incarceration, as required by their amended treatment plans. As this was an EPP case, the court noted that the child required the "stability, safety, [and] consistency" that could only be achieved through termination of parental rights. The record supports the court's findings.

5

¶ 13    The caseworker testified that the parents complied with their *amended* treatment plans to the best of their ability and actively engaged in services, such as life skills, therapy, and family time. But "even substantial compliance" may not be enough "to render the parent fit." *People in Interest of S.L.*, 2017 COA 160, ¶ 11. To that end, the caseworker — who the court qualified as an expert in the areas of child protection and child welfare — opined that the parents were not fit and unlikely to become fit within a reasonable time because they "hardly did anything" to engage with the case while out of custody. Indeed, the caseworker had concerns about their ability to continue their engagement and maintain sobriety once they returned to the community. She stated that the parents failed to engage in substance use treatment or consistent sobriety monitoring prior to their incarceration, and they did not consistently attend family time.

¶ 14    The caseworker also indicated that mother had not sent her a detailed release plan. While father had a basic plan, the caseworker deemed it insufficient given the child's extensive medical needs and because it involved changing the child's necessary and complicated therapy schedule to accommodate father. The caseworker

explained that the parents did a "fabulous job" during family time sessions, but parenting the child "24 hours a day, 7 days a week" would look much different, especially as the child's needs increased.

¶ 15    Still, father contends that he "would soon be able to parent [the child] upon his entry in[to] community corrections" and thus would be available to parent in a reasonable time. But he admitted in his testimony that he was not "100 percent" certain he would be accepted into community corrections. An expert in incarcerated parenting further reported that the first phase of community corrections required strict adherence to a schedule and that father would not be available for "[m]uch of anything." The expert opined that father could "not expect to be a full-time parent" while in the program. Moreover, the caseworker testified that, even if father was discharged to community corrections, she did not believe father could become a fit parent within a reasonable period of time because of the amount of time she knew the program required. Nor did she believe it was in the child's best interest to wait for father to be released.

¶ 16    The caseworker also testified that she did not know if there was any amount of additional time to allow the parents to become

7

fit. She thought this because the case had "already been open for two years" and "time hasn't stopped for [the child]," meaning his medical complexities were "only getting worse." Ultimately, the caseworker believed that termination was in the child's best interest because the child needed the permanency and stability that termination would provide.

¶ 17    Based on this testimony, the record supports the juvenile court's finding that the parents would not become fit within a reasonable time, and therefore, we will not disturb it.[1] *See S.Z.S.*, ¶ 27.

### 4. The Court Did Not Err When It Considered the Parents' Incarceration

¶ 18    The parents further argue that the juvenile court improperly based its fitness findings on their incarceration status. We disagree.

¶ 19    As the parents assert, the General Assembly in 2023 repealed subsection (1)(b) of section 19-3-604, which allowed consideration

---

[1] We reject mother's argument that the juvenile court's reliance on her prior dependency and neglect history was error. Section 19-3-604(2)(l), C.R.S. 2025, explicitly allows the court to consider a parent's past involvement with a department of human services.

of a parent's long-term confinement status in the termination of parental rights. *See* Ch. 191, sec. 7, § 19-3-604, 2023 Colo. Sess. Laws 957 (repealing former section 19-3-604(1)(b)(III)). Indeed, S.B. 23-039's legislative declaration states, in relevant part, that "decisions to terminate parental rights should be based on the needs of the child, and not *solely* on the status of the parent as incarcerated or the length of the sentence." 2023 Colo. Sess. Laws at 953 (emphasis added). In other words, the General Assembly confirmed that, while a court cannot rely on a parent's incarceration as the *sole* reason for termination, it may still consider incarceration as a factor in its decision.

¶ 20 Here, the juvenile court explicitly acknowledged this by stating that, while it was "not making its finding based on [the parents'] incarceration, the law does allow [the court] to use that as one factor and the [c]ourt does take that into consideration." As described above, the court also considered the parent's historical lack of compliance; the child's age, need for permanency, and significant needs; and the parents' lack of a sufficient release plan.

¶ 21 Therefore, although a factor in the juvenile court's decision, the court did not use the parents' incarceration status as the *sole*

9

reason for finding the parents unfit. *See K.D. v. People*, 139 P.3d 695, 703 (Colo. 2006) (The court did not err when it "carefully considered how [the parent's] continued incarceration affected his fitness and his corresponding ability to meet [the child's] needs within a reasonable time."). Accordingly, we conclude that the court did not err.

## C. Reasonable Efforts

¶ 22 Both parents assert that the Department failed to make reasonable efforts to rehabilitate them and reunite the family. We discern no reversible error.

### 1. Preservation

¶ 23 The Department and the guardian ad litem contend that the parents failed to preserve the reasonable efforts issue that they now raise on appeal. We disagree as to mother but conclude father waived his reasonable efforts claim.

¶ 24 While mother did not address the issue of reasonable efforts during the termination hearing, she did file a motion for a lack of reasonable efforts finding shortly before the termination hearing. Thus, mother brought the issue to the juvenile court's attention and appropriately preserved her claim. *See S.Z.S.*, ¶ 18 (noting that to

10

preserve an issue, a party must present "the court with an adequate opportunity to make findings of fact and legal conclusions").

¶ 25    However, father explicitly waived his reasonable efforts claim. *See People in Interest of D.P.,* 160 P.3d 351, 355 (Colo. App. 2007) ("Statutory rights accorded to respondent parents in dependency and neglect proceedings are subject to waiver."). In closing argument, father's counsel said that he was "not making an argument today about reasonable efforts" and that "the testimony of [the caseworker] is clear that she has made excellent efforts and [went] above and beyond for [father]." *See People in Interest of E.C.,* 259 P.3d 1272, 1276 (Colo. App. 2010) (holding that a parent waives their right to raise reasonable efforts on appeal when they do not assert that a department's efforts were deficient and do not bring the matter to the court's attention in any other way).

## 2.    Applicable Law

¶ 26    A human services department must make reasonable efforts before a juvenile court may terminate parental rights under section 19-3-604(1)(c). §§ 19-1-103(114), 19-3-100.5(1), 19-3-208, C.R.S. 2025; § 19-3-604(2)(h). "Reasonable efforts" means the "exercise of

diligence and care" for a child who is in out-of-home placement. § 19-1-103(114).

¶ 27   To that end, services that are provided in accordance with section 19-3-208 are consistent with reasonable efforts. § 19-1-103(114). As relevant here, the services that "must be available and provided" include family time. § 19-3-208(2)(b). A child is entitled to in-person family time unless a court finds that the child's health and safety is endangered by face-to-face contact. *People in Interest of D.G.*, 140 P.3d 299, 305 (Colo. App. 2006). A parent's incarceration, in and of itself, does not excuse a department from making reasonable efforts, including providing family time services. *See* §§ 19-3-507(1)(f)(I), 19-3-508(1)(e), C.R.S. 2025.

¶ 28   To evaluate whether a department made reasonable efforts, the court should consider whether the services provided were appropriate to support the parent's treatment plan. *People in Interest of S.N-V.*, 300 P.3d 911, 915 (Colo. App. 2011). Whether a department made reasonable efforts "must be measured holistically rather than in isolation with respect to specific treatment plan objectives." *People in Interest of My.K.M. v. V.K.L.*, 2022 CO 35,

12

¶ 35. The parent is ultimately responsible for using the services provided to obtain the assistance needed to comply with the treatment plan. *People in Interest of J.C.R.*, 259 P.3d 1279, 1285 (Colo. App. 2011). The court may therefore consider a parent's unwillingness to participate in treatment when determining whether a department made reasonable efforts. *People in Interest of A.V.*, 2012 COA 210, ¶ 12.

### 3. Any Initial Failure in Reasonable Efforts Was Harmless

¶ 29 Mother argues that the Department failed to provide reasonable efforts because it did not: (1) timely amend her treatment plan to account for her incarceration; (2) provide services or facilitate virtual and in-person family time for months after her incarceration; and (3) maintain caseworker contact for nearly a year.

¶ 30 The juvenile court acknowledged that the Department "was not actively engaging" mother when she was initially incarcerated. Still, the court found that "even if [the Department] had engaged sooner" mother "would not be in a different position." Specifically, the court noted that the Department's failure "wouldn't have

13

changed [mother's] ability to parent and address her substance abuse issues any sooner." Ultimately, the court found that the Department made reasonable efforts.

¶ 31 To be sure, the record shows that when mother was first incarcerated the Department's attempts to provide reasonable efforts were lacking. The former caseworker failed to timely amend mother's treatment plan to reflect her incarceration, keep in contact with mother, set up family time visits, or investigate services available to mother at her facility. The current caseworker agreed that the Department did very little when the former caseworker worked on the case.

¶ 32 However, we "must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." C.R.C.P. 61. "An error affects a substantial right only if 'it can be said with fair assurance that the error substantially influenced the outcome of the case or impaired the basic fairness of the trial itself.'" *People in Interest of C.C.*, 2022 COA 81, ¶ 20 (citation omitted). And we are not persuaded that the Department's failure to provide reasonable efforts during mother's initial incarceration impacted the outcome here.

¶ 33     Importantly, the record shows that the Department's efforts quickly improved when the current caseworker was assigned to the case over a year prior to the termination hearing.  The caseworker testified that she knew of the deficiencies in the former caseworker's efforts and quickly rewrote mother's treatment plan, investigated and provided referrals for services, maintained consistent contact with mother, communicated with mother's case manager, and set up regular in-person family time visits in addition to mother's virtual family time sessions.

¶ 34     Notably, mother does not argue these subsequent Department efforts were lacking, and the court credited mother's engagement with her amended treatment plan while in custody.  But ultimately, as described above, the juvenile court found mother unfit based on her noncompliance *prior* to her incarceration — as well as the child's age and medical needs, mother's failure to provide a release plan, and her historical dependency and neglect involvement.

¶ 35     Given this evidence and the court's findings, the Department's initial failure to provide services to mother while incarcerated was harmless.  *See* C.R.C.P. 61.

## D.     Less Drastic Alternatives

¶ 36     Both parents argue that the juvenile court erred by failing to consider an allocation of parental responsibilities (APR) as a less drastic alternative to termination of their parental rights.  We disagree.

### 1.     Applicable Law

¶ 37     Before terminating parental rights, the juvenile court must consider and eliminate less drastic alternatives.  *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 40.  In doing so, it must give primary consideration to the child's physical, mental, and emotional conditions and needs.  *People in Interest of Z.M.*, 2020 COA 3M, ¶ 29.  The court may consider, among other things, (1) whether an ongoing relationship with the parent would benefit the children, *J.C.R.*, 259 P.3d at 1285; (2) whether the children are bonded to the parent, *People in Interest of D.P.*, 181 P.3d 403, 408-09 (Colo. App. 2008); and (3) whether the alternative placement option favors adoption rather than an APR, *S.N-V.*, 300 P.3d at 920.

¶ 38     A less drastic alternative is not viable simply because it is "adequate."  *A.M.*, ¶ 27.  Rather, it must be in the child's best interests.  *Id.*  Thus, if the juvenile court considers less drastic

alternatives but finds instead that termination is in the child's best interests, it must reject the alternatives and order termination. *Id.* at ¶ 32. And we must affirm that decision if the court's findings are supported by the record. *People in Interest of B.H.*, 2021 CO 39, ¶ 80.

### 2. The Court Did Not Err by Finding No Less Drastic Alternative

¶ 39 The juvenile court found that the child "deserves stability, safety, and consistency," which could only be achieved through termination of the parents' parental rights. The court further found that termination was in the child's best interest, noting that this was an EPP case. And the court determined that "[e]ven if the foster parents were willing to take [an APR] the [c]ourt would not change [its] ruling." *See S.Z.S.*, ¶ 25.

¶ 40 The record supports the court's findings. The caseworker opined that the child "needs permanency" and "the stability that [the child's] placement is able to provide to him especially with his ongoing medical needs." She testified that an APR was not an option for the foster family. An expert in the field of child development and attachment further opined that the child needed

17

consistency and structure. The expert believed that the child's primary attachment was to the foster family and that "it would be a significant detriment for him to be removed from his only attachment figure that he's ever known." This was especially true considering the child's medical needs and that the child was neuroatypical. The court found this testimony credible. *See A.J.L.*, 243 P.3d at 249-50.

¶ 41 We also reject father's argument that "keeping the case open, without an [APR]" was in the child's best interests. The caseworker believed there would be "significant harm" to the child if the case remained open because of how dysregulating family time visits were to him and his need for stability. And the expert witness opined that the sooner the child resolved the uncertainties around his attachment figures "the faster or more efficiently he can gain his autonomy and independence and work on the skills that he's working on."

¶ 42 Accordingly, because the juvenile court's finding that there was no less drastic alternative to termination is supported by the record, we have no basis to disturb it on appeal. *See B.H.*, ¶ 80.

### III. Disposition

¶ 43 The judgment is affirmed.

JUDGE FREYRE and JUDGE JOHNSON concur.